(No. 54021.–

CARADCO WINDOW AND DOOR, Appellee, v. THE IN-DUSTRIAL COMMISSION *et al.* (Maria E. Lawson, Appellant).

*Opinion filed September 30, 1981.*

F. Don Kelly, of Peoria, for appellant.

Howard W. Small, of Thomas, Mamer & Haughey, of Champaign, for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

This is a workmen's compensation case. The employee, Maria Lawson, filed a claim under the Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*) against Caradco Window and Door for accidental injury allegedly sustained in the course of her employment. The arbitrator entered an award for medical expenses, temporary total disability, and 45% loss of use of her left arm. The Industrial Commission, on review, confirmed the arbitrator's decision as to the award of medical expenses; made an award of additional medical expenses incurred to that date; and, finding the claimant to be totally and permanently disabled, awarded her $108.30 per week for life. The circuit court of Champaign County found that the Commission's determination that claimant's injury arose out of her employment was against the manifest weight of the evidence, and set aside the award. Maria Lawson appeals to this court pursuant to Rule 302(a). 73 Ill. 2d R. 302(a).

Claimant was hired by Caradco as a window-sash assembler on November 8, 1976. At that time she was 35 years of age. On November 13, 1976, in the course of her usual duties, she was reaching up to remove a wooden part, weighing approximately two pounds, from a bin above her head when she felt a sharp pain in her neck and left arm running down to her left hand. The pain was so severe that she dropped the part; she was unable to move her left arm without great pain. Claimant was taken to Paxton Hospital and treated by the company doctor, Dr. Ronald Grove. Dr. Grove prescribed pain medication, muscle relaxants and a neck brace, and kept her off work for a week.

Claimant continued to work from November 20 through February 2, 1977, although she testified that she continued to have pain and weakness in her neck and left arm. During January 1977 she was treated by Dr. Milton Carlson, an orthopedic surgeon. On February 3, 1977, claimant was again hospitalized after another onset of severe pain. During February and early March, she was hospitalized twice under Dr. Carlson's care for a total of 29 days. She received pain medication, muscle relaxants, heat packs, traction and physical therapy. Neurological and diagnostic tests were performed. She appeared to respond to this therapy and was free of symptoms by the time of her discharge from Mercy Hospital on March 7, 1977.

After her release from the hospital, the claimant did not return to work. On March 22 she suffered another onset of pain after bending to pick up a fork from her kitchen floor, and on March 23 she was rehospitalized. She was discharged on April 6, 1977. Her neck and arm continued to give her trouble, however, and on April 21, 1977, she consulted Dr. Walter Petersen, an orthopedic surgeon in private practice.

Dr. Petersen initially prescribed the same course of treatment previously employed during claimant's hospitalizations, with some apparent success. He subsequently advised claimant that a laminectomy (disc removal and fusion of the cervical vertebrae) might remove the source of her problem. The laminectomy was performed on June 30, 1977; however, the fusion was unsuccessful and had to be redone in October 1977.

By June 1978 claimant had so far recovered that Dr. Petersen released her to return to work. In August 1978, however, complications occurred involving the hip from which bone for the laminectomy graft had been taken. Further surgery to alleviate this problem had to be performed in October 1978. From October 1978 until the time of the review hearing in July 1979, although her hip improved, claimant was again troubled by neck and left arm

pain, and was treated by Dr. Petersen and two other physicians during this period.

The dispute between the parties to this appeal centers on the issue of causal connection between the incident of November 13, 1976, and claimant's subsequent medical problems. Caradco contends that Maria Lawson's current condition of ill-being is the result of a preexisting spinal condition, and that the accident on November 13 did not aggravate this condition so as to cause a compensable injury. While not disputing that an accident occurred that was in the course of claimant's employment, Caradco argues that there was no causal connection between that injury and her later hospitalizations and surgeries.

As a threshold issue, claimant contends that Caradco waived the issue of causal connection by agreeing at the hearing to the arbitrator's recital of facts, including the statement that "on said date petitioner sustained accidental injuries which did arise out of and in the course of her employment." We disagree. Caradco, by contesting liability for claimant's medical expenses, clearly put their causal relation to the employment in issue. The determination of liability necessarily involves the issue of causation. The record indicates both parties' recognition of this fact. Moreover, since claimant did not object before the arbitrator or the Commission to the introduction of evidence going to this issue, she cannot do so now. *District 141, International Association of Machinists & Aerospace Workers v. Industrial Com.* (1980), 79 Ill. 2d 544, 556-57.

No live testimony by medical experts was presented at the arbitration hearing or on review. Both sides introduced the medical records and reports of the treating physicians, including their diagnoses and medical opinions as to the relation between the November 13, 1976, injury and claimant's later hospitalizations and surgeries. An excerpt from a report by Dr. Carlson, dated March 14, 1977, is representative:

"As far as the injury being work-related, I think that the original episode of neck and arm pain would have to be considered work-related, as she related a history of minor injury at work. She was sent in as a workmen's compensation case. *** I think that her neck problem is a combination of things involving some degenerative disease and a great deal of anxiety and tension, and probably was a condition that pre-existed her work injury; although, of course, it is certainly reasonable that the injury she sustained at work may have set off the episode of pain, and so forth, that resulted in her symptoms and subsequent hospitalization."

Dr. Carlson diagnosed claimant's condition as a "syndrome *** that could have been due to either cervical arthritis, disc, or thoracic outlet syndrome." Dr. Petersen diagnosed claimant as suffering from cervical spondylosis, which he felt was referring pain to the lower nerve roots of the left arm. Cervical spondylosis is defined as "a degenerative joint disease affecting the cervical vertebrae, intervertebral discs, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arm as a result of pressure on the nerve roots." Dorland's Illustrated Medical Dictionary (25th ed. 1974).

Caradco also introduced records from two hospitals in Mississippi at which claimant was treated at various times during 1974 and 1975 for pain in her neck and left arm. (She also had surgery for lower back and leg pain, not involved here.) Claimant at that time related a history of "chronic posterior neck pain that was intermittent in character and usually aggravated by activity." Neurological tests indicated spondylosis in an early stage that physicians regarded as of minor significance at the time. Claimant admitted the prior history of neck and arm pain, but stated that in 1975 the pain was different, more of a spasmic-type pain, and she could get rid of it with muscle relaxants. She also stated that her neck had given her no trouble after July 1975 until

November 13, 1976. During most of this period she had been employed as assistant manager of a motel and also at a trailer court; her duties at the motel included making beds and helping in the kitchen, and her duties at the trailer court included making such minor repairs as laying tile and putting up paneling, involving lifting and reaching above her head, and she testified that she had had no complaints then. In August 1976 she worked for Webster Contractors, where she lifted heavy bags of vegetables and lifted potatoes above her head to put into a peeler.

The question whether a claimant's disability is attributable to a degenerative condition or to the aggravation, by an accident, of a preexisting condition, is a question of fact for the Industrial Commission. (*Republic Steel Corp. v. Industrial Com.* (1980), 82 Ill. 2d 76, 86; *Ross v. Industrial Com.* (1980), 79 Ill. 2d 258, 261.) Its determination will be upheld, unless contrary to the manifest weight of the evidence, particularly where it involves the resolution of conflicting medical opinions. (*Azzarelli Construction Co. v. Industrial Com.* (1981), 84 Ill. 2d 262, 267; *Valley Mould & Iron Co. v. Industrial Com.* (1981), 84 Ill. 2d 538, 544.) Here there was medical testimony in the record from which the Commission could have inferred that the claimant's work activities aggravated her preexisting condition. The Commission could also consider the claimant's own testimony concerning her condition before and after the accident, medical testimony not being required to establish a causal connection. (*Pulliam Masonry v. Industrial Com.* (1979), 77 Ill. 2d 469, 471.) The Commission has the responsibility for assessing credibility and drawing reasonable inferences from testimony, and we will not substitute our judgment simply because we might have reached a different conclusion. Viewing the record as a whole, we cannot say that the Commission's determination with respect to causal connection was against the manifest weight of the evidence.

Caradco raises the additional issue whether claimant

has sustained her burden of proving permanent and total disability. For purposes of section 8(f) of the Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(f)), a claimant is permanently and totally disabled when he cannot perform any services except those for which no reasonably stable labor market exists (*C. R. Wikel, Inc. v. Industrial Com.* (1977), 69 Ill. 2d 273, 278). In determining whether the employee is capable of performing any useful services, the Commission must consider the age, training, education and skills of the employee, the extent of the injury, and the nature of the employment. *A.M.T.C. of Illinois, Inc. v. Industrial Com.* (1979), 77 Ill. 2d 482, 489; *Consolidated Freightways, Inc. v. Industrial Com.* (1976), 64 Ill. 2d 312.

We believe that claimant presented facts sufficient to permit the Commission to infer that she was permanently and totally disabled within the meaning of section 8(f). An employee does not have to be reduced to a state of total incapacity before total and permanent disability compensation can be awarded. (*E. R. Moore Co. v. Industrial Com.* (1978), 71 Ill. 2d 353, 360.) Claimant testified that she had sought work, and had consulted with the Illinois Division of Vocational Rehabilitation, but had been unable to find employment. The only medical testimony regarding disability was that of Dr. Petersen, who stated that permanent partial impairment of the use of claimant's left arm was anticipated. However, claimant's own testimony to continuing pain and loss of strength of grip in her left hand, and that she required her daughter's help in doing housework, would permit the Commission to infer that she would be unable to work at any job requiring lifting, reaching over her head, or other similar physical activity. Though the record contains no information concerning her education or training, her previous job experience indicates that she is qualified only for unskilled or semi-skilled employment of types which would usually involve at least some light physical labor. We find that claimant made a *prima facie*

showing of disability, and that under the circumstances the burden was on the employer to show that there were jobs available that claimant could perform without endangering life or health. (*E. R. Moore Co. v. Industrial Com.* (1978), 71 Ill. 2d 353.) The judgment of the circuit court of Champaign County is therefore reversed.

*Judgment reversed;*
*award reinstated.*