2026 IL App (1st) 242584WC-U
No. 1-24-2584WC
Order filed January 16, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SOURCE ONE STAFFING, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 24L4548 |
| | ) | |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.*, | ) | Honorable |
| | ) | Daniel P. Duffy, |
| (Ciro Servin Cabrera, Appellee). | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holdridge and Justices Mullen, Barberis, and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the Illinois Workers' Compensation Commission's decision was not against the manifest weight of the evidence.

¶ 2    In November 2019, claimant, Ciro Servin Cabrera, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2018)), seeking benefits from his employer, Source One Staffing (employer), regarding injuries to his neck, back, and shoulders he sustained from an October 14, 2019, accident.

¶ 3    Following a May 2023 hearing, the arbitrator found claimant's accidental injury

arose out of and in the course of his employment and his condition of ill-being was causally related to the October 14 accidental injury. The arbitrator found claimant was temporarily and totally disabled from November 4, 2019, through May 25, 2023, and therefore eligible for temporary and totally disability (TTD) benefits during said period. The arbitrator also found claimant was entitled to prospective medical care for a surgical procedure and related care, as recommended by his treating physician, Dr. Matthew Ross. On review, the Illinois Workers' Compensation Commission (Commission) modified the arbitrator's average weekly wage determination but otherwise affirmed and adopted the arbitrator's findings. Upon judicial review, the circuit court of Cook County confirmed the Commission's decision, finding it was neither contrary to law nor against the manifest weight of the evidence. On appeal, employer claims the Commission's (1) ultimate decision, (2) causal finding, and (3) TTD award were against the manifest weight of the evidence because the Commission relied on the opinions of a physician who completely misunderstood the mechanism of injury.

¶ 4                                    I. BACKGROUND

¶ 5                                  A. Hearing Testimony

¶ 6        Claimant testified with the assistance of a Spanish interpreter at a hearing on May 25, 2023. He stated, on October 14, 2019, he worked for employer, an industrial staffing service, wherein he was performing work for Greco & Sons (who is not a party to this appeal), a distribution warehouse. He described his job as "pilling," which required him to put pallets into various piles, ten pallets high, so a forklift could eventually move them. The only personal protective equipment he was required to wear was steel-toed shoes. On the date of the accident, at approximately 11 p.m., claimant recalled standing on a pallet when someone operating a "pallet jack" was "coming too fast" and hit the pallet. This caused him to lose his balance and fall forward into a stack of

pallets. The pallet jack continued moving and struck the pallet he was previously standing on, which caused him to fall to the ground. He stated he immediately felt pain in his chest and back. He stated his right shoulder became "twisted" and the right side of his head was against some pallets. He recalled remaining stuck in this position for "12 or 15 minutes," until his supervisor arrived.

¶ 7        Claimant went to Saint Joseph Hospital at approximately 3 a.m., where he received x-rays and prescription medication before being discharged. He stated he continued to feel unwell and went to Physicians Immediate Care later that same day, wherein he received an "injection" behind his "left shoulder." He was given work restrictions. On October 16, 2019, he visited Tyler Medical Services at the referral of employer. He remained on light-duty work and returned to Tyler Medical Services for several follow-up appointments.

¶ 8        On November 4, 2019, claimant visited Dr. Mukeshchandra Patel, who ordered him to take time off from work. He visited Dr. Ross on December 5, 2019, who continued to treat him through the date of the hearing. Dr. Ross ultimately recommended claimant undergo neck surgery. Dr. Ross also referred claimant to Dr. Steven Chudnik for issues related to his shoulders. Claimant recalled being examined by Dr. Thomas Stanley in January 2020 and Dr. Joshua Alpert in October 2021 at the request of the insurance company. Claimant stated he did not have any injuries to his neck, shoulders, head, or back prior to October 14, 2019. He stated he wanted to undergo the neck surgery recommended by Dr. Ross to alleviate the pain from the middle of his neck down to his lower back.

¶ 9        On cross-examination, claimant denied having any issues with his head, despite the fact his medical records referenced a "chronic infarct" in his brain. Claimant denied being involved in a "car accident." The interpreter read into the record, in English, claimant's written statement

from an employee accident report submitted after the accident. The report stated,

> "I was putting together pallets when a coworker was driving a pallet jack. Accidentally, he hit the pallets. The pallets hit me on my feet, and I landed on top of the pallets *** Before I lost—before getting up, he went around with a pallet jack and then hit them again and I landed on the floor—and then I landed. I landed on the floor."

In another section of the report, claimant wrote,

> "Before I lost, gotten up, the pallet jack turned around and hit them again, and I ended up on the floor. I hit on the right side of my body, arm, right arm, head. I had pain on my arm, on my right arm, pain in the head, and pain in my chest. I reported it to [my supervisor]. He gave me time to sit down to see if the pain will go away. The pain got worse. I asked for an ambulance. I asked for an ambulance because I did not feel well to drive. He told me that they called the ambulance, but the ambulance never came, and he told me that they could not transport me, could not take me. I drove to Saint Joseph Hospital so they could see me, ER."

¶ 10                      B. Medical Records

¶ 11                      1. *Saint Joseph Hospital*

¶ 12        Medical records from Saint Joseph Hospital from October 15, 2019, following the accident, showed claimant complained of torso and head pain. Triage notes show claimant stated he was "pushed by a fork lift driver" and fell backwards onto pallets before he lost his balance and fell forward onto pallets. The treating physician's notes stated claimant complained of chest and back pain after he was "nudged and fell backwards and then forward to the right." Claimant reported a "minor head injury, his leg was bent beneath him, and his right shoulder/arm was twisted

behind him." The physician's notes indicated no neck pain. Claimant complained of a mild headache but denied any numbness or weakness.

¶ 13                                    2. *Physicians Immediate Care*

¶ 14          Medical records from Physicians Immediate Care from October 15, 2019, showed claimant stated a forklift driver "hit him with some pallets 2 times," which caused him to fall forward and then toward his right side. Claimant's chief complaint was back pain, which he rated as 6 out of 10 for pain. He received a trigger point injection to his right scapula for pain. Claimant was diagnosed with minor strains to the muscles and tendons of the back wall of his thorax, shoulder, and upper left arm.

¶ 15                                    3. *Tyler Medical Services*

¶ 16          Medical records for Tyler Medical Services from October 16, 2019, showed claimant complained of pain to the "right side of his face, left shoulder, and chest area." No neck pain was reported. The records indicated claimant stated he was struck by a pallet jack that caused him to fall, striking the right side of his face, left shoulder, and chest area. He was diagnosed with contusions to the right side of his face, left shoulder, and anterior chest. Records from October 28, 2019, showed claimant complained of "neck pain and numbness, tingling and weakness in the upper extremities."

¶ 17                                    4. *Dr. Patel*

¶ 18          Dr. Patel's records from November 4, 2019, showed claimant was evaluated for headache and neck and shoulder pain. Dr. Patel ordered claimant off work and referred him to physical therapy and an orthopedic consultation.

¶ 19                                    5. *Center for Diagnostic Imaging*

¶ 20          On November 11, 2019, claimant underwent MRI imaging. The records showed he

was seen for a forklift accident involving a fall, with pain in both shoulders and neck. Claimant also complained of numbness, tingling, and weakness in his shoulders and neck. The MRI noted degenerative disc disease with stenosis. There was "[i]ndentation of the spinal cord at the C4-C5, C5-C6, and C6-C7 levels secondary to disc bulges." Regarding claimant's right shoulder, the MRI showed moderate acromioclavicular hypertrophy with moderate edema, Type II acromion and moderate fluid in the bursa with focal full-thickness tear of the distal supraspinatus tendon, and a tear of the superior labrum extending into the posterior superior labrum. Claimant's left shoulder showed similar findings, with additional mild tendinosis of the intraarticular long head biceps tendon.

¶ 21                                6. *Dr. Ross*

¶ 22        Dr. Ross's records from December 2019 showed claimant complained of neck, back, bilateral shoulder, and chest pain following a work injury. The records indicated claimant was struck by a motorized pallet jack that claimant estimated was traveling "approximately 20 [miles per hour]." Claimant indicated he was thrown chest first onto a pallet and then twisted onto his side. He demonstrated full range of motion in his neck but significantly reduced range of motion of his left shoulder. The records showed claimant exhibited "guarding" due to shoulder pain that inhibited Dr. Ross's ability to perform a full neurological exam. Dr. Ross suggested claimant had "cervical radiculopathy and/or brachial plexus injury" in addition to shoulder symptoms. Dr. Ross recommended claimant consult with an orthopedic surgeon regarding his shoulders.

¶ 23                                7. *VNA Health Care*

¶ 24        Medical records from VNA Health Care from December 2019 showed claimant was examined for health reasons unrelated to his work accident. The records indicated a history of

a motor vehicle accident. The records showed claimant had recently fallen at work and been involved in a motor vehicle collision. "Motor vehicle collision" was listed as a diagnosis.

¶ 25                                    8. *Dr. Chudnik*

¶ 26          Dr. Chudnik's records from January 2020, showed claimant complained of bilateral shoulder and neck pain. Claimant indicated he was crushed between pallets that had been pushed by a pallet jack, which caused him to fall and hit his head, neck, and shoulders. Dr. Chudnik indicated claimant suffered from a pinched cervical nerve. Despite normal electromyography (EMG) findings, Dr. Chudnik recommended bilateral shoulder surgery.

¶ 27                              C. Evidence Depositions

¶ 28                              1. *Deposition of Dr. Chudnik*

¶ 29          In June 2020, Dr. Chudnik testified he was a board-certified orthopedic surgeon who primarily focused on injuries to shoulders and knees. He explained the mechanism of claimant's injury was that a pallet jack had pushed pallets toward claimant, causing him to be crushed and fall. He diagnosed claimant with bilateral rotator cuff tears. He noted someone claimant's age would be susceptible to rotator cuff tears and attributed claimant's tears to his work accident. He explained rotator cuff tears can be caused without any specific trauma to the shoulder and by "quick, abrupt moving of the arm which required the muscles to contract and pull violently to capture themselves or brace themselves." He stated a two-week delay in symptoms would not be uncommon for a shoulder injury. He recommended claimant undergo surgical repair for his shoulder injuries but deferred the treatment until claimant's neck injuries were treated.

¶ 30          Dr. Chudnik disagreed with Dr. Stanley's assessment regarding the age of the rotator cuff tears and found them to be "acute and new and not preexisting." He also disagreed with Dr. Stanley that an individual with a rotator cuff tear would have difficulty removing clothing.

He explained there were four muscles to the rotator cuff and tearing a portion of one of them would not limit the ability to move the shoulder to take a shirt off. He further explained that old rotator cuff tears are "retracted" and have "atrophy," which was not present in claimant's tears. He stated the MRI did not suggest the tears were old.

¶ 31                                2. *Deposition of Dr. Stanley*

¶ 32        In October 2022, Dr. Stanley testified he was a board-certified orthopedic surgeon who has performed numerous surgeries on the neck and upper and lower back, as well as surgeries to correct deformities and treat infections. He described claimant's mechanism of injury as him falling twice and hitting his right side. He stated claimant had blunt trauma to his shoulder from the falls. He recalled his notes indicated claimant had injured his head, left shoulder, and chest after being struck by a pallet jack. He stated claimant had positive Waddell signs and had failed distraction tests, which indicated nonorganic pain. He opined claimant's mechanism of injury did not support acute bilateral rotator cuff tears, which he stated was consistent with MRI testing, which had showed a chronic degenerative process. He concluded treatment to claimant's shoulder was unrelated to his work accident or blunt trauma. He stated claimant suffered from cervical radiculopathy related to his work accident but noted claimant's ongoing complaints of pain were not cervical radiculopathy and were consistent with nonorganic pain. He opined claimant's shoulder contusion and cervical radiculopathy had resolved by the time he evaluated claimant in January 2020. He conceded no other physician who had evaluated claimant indicated positive Waddell signs and that claimant did not have any neck or upper extremity complaints prior to the work accident.

¶ 33                                3. *Deposition of Dr. Ross*

¶ 34        In June 2022, Dr. Ross testified he was a board-certified neurosurgeon who

primarily treated patients with spinal issues. He explained claimant's mechanism of injury as being struck by a "loaded stand-up motorized pallet jack *** traveling approximately 20 miles an hour." He stated claimant was thrown chest first onto a pallet and then "twisted onto his side." He noted he could only partially make a diagnosis at claimant's initial evaluation because of claimant's shoulder issues. He also noted claimant had preexisting arthritis in the neck but found no evidence claimant was actively symptomatic from any neck arthritis prior to the work accident. He stated claimant's negative EMG indicated there was no brachial plexus injury and likely no cervical radiculopathy. He interpreted an updated MRI from January 2021, which, in his opinion, showed claimant had disk herniations and more severe spinal stenosis than the original MRI had shown. He opined the disk herniations were caused by claimant's work accident or became symptomatic because of the work accident.

¶ 35        Dr. Ross disagreed with Dr. Stanley that claimant demonstrated signs of malingering or nonorganic symptoms. On cross-examination, Dr. Stanley admitted he did not know the details of claimant's mechanism of injury. He explained, "[W]hen you're dealing with traumatized patients, getting that kind of specificity is sometimes difficult. It happens in a split second and you're asking them to try to reconstruct." He went on to say, "It doesn't matter whether he lands on his right shoulder, his left shoulder, or his chest, if he's now symptomatic, the proximate cause is the trauma." He explained the cervical spine condition would naturally and progressively become worse. He confirmed the first time he diagnosed claimant with myelopathy was in February 2021. He explained myelopathy meant claimant was having "trouble in his spinal cord from the pathology in his neck" and that he needed intervention for the issue. He conceded claimant may have potentially required surgery in the future for his disk degeneration but stated the work accident caused it to happen much sooner. He noted claimant's myelopathy "became

- 9 -

clear in the fullness of time" and was significantly worse than his shoulder condition, "even though in the beginning it seemed the reverse." Regarding Waddell signs, he explained claimant's primary issue was a spinal cord injury and myelopathy, which "doesn't follow a dermatomal pattern."

¶ 36                                              4. *Deposition of Dr. Alpert*

¶ 37          In January 2023, Dr. Alpert testified he was a board-certified orthopedic surgeon who primarily treated injuries to the shoulder and knee. He described claimant's mechanism of injury as being hit by a pallet jack, causing him to fall on top of a pallet pile. He stated claimant's foot got caught in a pallet and he fell onto his right side and hit the right side of his neck on the pallet. Claimant's right arm went behind his back, and his chest hit the floor. He agreed with Dr. Stanley that blunt-force trauma would not cause claimant's shoulder symptoms. He noted his own examination showed inconsistent symptoms with rotator cuff tears and the MRI imaging did not show any recent tears. He did not note any symptom magnification by claimant or malingering. He had no opinion regarding claimant's cervical spine or whether his symptoms of numbness or tingling were shoulder- or cervical-related. He diagnosed claimant as having right shoulder pain referred from cervical radiculopathy. Regarding whether the referred pain occurred as a result of the work accident, Dr. Alpert stated, "I just don't know." He did not recommend surgical intervention for either of claimant's shoulders and stated claimant was at maximum medical improvement for his shoulder conditions. He stated claimant's shoulder condition did not inhibit his ability to perform his full work duties.

¶ 38          Dr. Alpert conceded he was not aware of claimant's work requirements. He also conceded repetitious moving and stacking of pallets over a two-year period could aggravate or accelerate a preexisting degenerative condition of the upper extremities. He agreed, regardless of the causation of claimant's injuries, he would be unable to perform the essential functions of his

job with employer.

¶ 39                                    D. Procedural Posture

¶ 40          The arbitrator found claimant to be a credible witness and stated there were no material contradictions between his testimony and the totality of the evidence that would make him unreliable. The arbitrator noted the VNA Health Care records mentioned a motor vehicle accident, but the arbitrator found no indication from any of the medical records or evidence presented that a motor vehicle accident had ever occurred. The arbitrator noted claimant denied being involved in a motor vehicle accident and suggested there could have been confusion as to the forklift being considered a motor vehicle. Regarding any inconsistencies pertaining to claimant's mechanism of injury and his explanations to various medical providers, the arbitrator found them to be insignificant and unintentional. The arbitrator attributed many of the inconsistencies to claimant's repeated explanations to several different providers over the years as to the nature of the accident and the language barrier.

¶ 41          The arbitrator found the totality of the evidence and claimant's unrebutted testimony supported a traumatic accident arising out of and in the course of his employment on October 14, 2019. The arbitrator noted claimant had no injuries involving his neck, back, shoulders, or head prior to the October 14 accident and suffered no new accidents or injuries since the accident. The arbitrator found Dr. Ross more credible than Dr. Stanley. The arbitrator noted Dr. Stanley found claimant's neck injury to be causally related to the work accident but claimed the injury no longer existed at the time of his evaluation. The arbitrator noted Dr. Stanley relied on Dr. Ross's initial cervical radiculopathy suggestion but noted Dr. Ross later found claimant's condition was a spinal cord injury. The arbitrator noted Dr. Alpert did not render an opinion regarding the causality of claimant's spinal condition. The arbitrator noted, Dr. Alpert agreed with

- 11 -

Dr. Ross's recommendation for neck surgery. The arbitrator found Dr. Ross's opinions to be more persuasive and reliable. The arbitrator concluded claimant's injuries to his neck, back, shoulders, face, and chest were causally related to his October 14 work accident.

¶ 42 The arbitrator found claimant was entitled to prospective medical care by Dr. Ross and again pointed to Dr. Alpert's testimony. Regarding TTD, the arbitrator found claimant became temporary and totally disabled on November 4, 2019, when Dr. Patel placed him off work. The arbitrator noted Dr. Chudnik's descriptions of the mechanism of injury included errantly stating claimant had been pinned between two pallets but noted Dr. Chudnik primarily indicated claimant's shoulder injuries were the result of falling and bracing himself rather than being pinned between pallets. The arbitrator noted, Dr. Alpert opined claimant could not perform the essential functions of his job with employer. The arbitrator concluded claimant had not reached maximum medical improvement and was entitled to TTD benefits through the date of the hearing.

¶ 43 The Commission modified the arbitrator's average weekly wage award downward, noting an errant calculation regarding overtime pay, but otherwise affirmed and adopted the remainder of the arbitrator's findings. The circuit court confirmed the Commission's decision.

¶ 44 This appeal followed.

¶ 45 II. ANALYSIS

¶ 46 On appeal, employer claims the Commission's (1) ultimate decision, (2) causal finding, and (3) TTD award were against the manifest weight of the evidence because the Commission relied on the opinions of a physician who completely misunderstood the mechanism of injury.

¶ 47 The purpose of the Act is to protect an employee from any risk or hazard which is peculiar to the nature of the work he is employed to do. *Hosteny v. Illinois Workers' Compensation*

*Comm'n*, 397 Ill. App. 3d 665, 674 (2009). To recover compensation under the Act, an employee must prove by a preponderance of the evidence all elements of his claim, including a causal connection between the injury and his employment. *Boyd Electric v. Dee*, 356 Ill. App. 3d 851, 860 (2005). An occupational activity need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003). It is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicts in the evidence. *Hosteny*, 397 Ill. App 3d at 674. The resolution of conflicts in medical testimony is also within the province of the Commission. *Sisbro*, 207 Ill. 2d at 206. The Commission's credibility determinations and other factual findings will not be disturbed on review unless they are against the manifest weight of the evidence. *Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶¶ 35-36. For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Id.* ¶ 35. The appropriate test as to whether the record contains sufficient evidence to support the Commission's decision is not whether a reviewing court might reach the same or a different conclusion. *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1013 (2011).

¶ 48        Employer concedes claimant was "knocked to the ground while at work" on October 14, 2019. Employer disputes this was the basis for the Commission's ultimate determination. Employer concedes claimant was credible at the hearing. However, employer argues claimant was not credible when describing his work accident to various evaluating physicians he visited after the accident. Employer points specifically to claimant's statement to Dr. Chudnik that he was crushed between pallets and his statement to Dr. Ross that he was struck by a loaded forklift traveling 20 miles per hour.

- 13 -

¶ 49        Employer argues the totality of the evidence shows claimant was nudged, which caused him to lose his balance before falling against a stack of pallets and then to the ground. Employer notes this is consistent with his statements given to Saint Joseph Hospital immediately following the accident. Employer contends the Commission erroneously cited claimant's language barrier as an explanation for his inconsistent statements to treating physicians. Employer notes the medical records do not indicate any communication barriers between medical providers and claimant. Employer argues claimant consistently escalated the nature of his work accident to subsequent providers following the initial work accident.

¶ 50        While we recognize the medical records show various discrepancies in the nature of claimant's work accident, there is no dispute, even from employer on appeal, that one occurred. Dr. Chudnik, for example, may have reported that claimant was initially pinned between two pallets, but he also noted claimant eventually fell. As the Commission properly noted, Dr. Chudnik's assessment findings were primarily based on claimant falling. Dr. Ross's testimony explained the exact mechanism of claimant's injury was not necessary to determine the nature and extent of his injuries. Furthermore, we find it eminently plausible that claimant's language barrier could have accounted for some of the discrepancies regarding the exact mechanism of the injury. It was abundantly clear from the hearing testimony that the attorneys took great care during direct and cross-examination to elicit from claimant his testimony regarding the details of his accident.

¶ 51        On appeal, employer, as the appellant, carries the burden of showing the Commission erred. *ABF Freight System v. Illinois Workers' Compensation Comm'n*, 2015 IL App (1st) 141306WC, ¶ 19. "It is not our role to reweigh evidence and substitute our judgment for that of the Commission." *Id.* Employer's arguments regarding discrepancies in the mechanism of injury precisely ask this court to reweigh the evidence and substitute our judgment for that of the

Commission. Employer correctly notes the Commission's decision must be supported by the record and not based on speculation or conjecture. See *Sisbro*, 207 Ill. 2d at 215. The record and hearing testimony in this case adequately support the conclusion claimant fell while at work and as a result suffered injuries to his head, neck, back, and shoulders. Accordingly, we disagree with employer's arguments that discrepancies in the mechanism of injury undermine the credibility determinations and weight of the evidence afforded by the Commission.

¶ 52 Employer next argues the Commission erred when finding claimant's injuries were causally related to his work accident.

¶ 53 Whether a causal relationship exists between a claimant's employment and his condition of ill-being is a question of fact. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984). A reviewing court may not substitute its judgment for that of the Commission on these issues merely because other inferences from the evidence may be drawn. *Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 407 (1984). This is especially true with respect to medical issues, wherein we grant substantial deference to the Commission because of the expertise it possesses in the medical arena. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979). We will not reverse the Commission's decision unless its findings are against the manifest weight of the evidence. *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 64 (2006). "Fact determinations are against the manifest weight of the evidence only when an opposite conclusion is clearly apparent—that is, when no rational trier of fact could have agreed with the agency." *Id.* When the evidence is sufficient to support the Commission's causation finding, we must affirm. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 833 (2002).

¶ 54 Employer again points to various discrepancies in the medical records regarding claimant's mechanism of injury. Employer contends the Commission erred when finding Dr. Ross

more credible than Dr. Stanley. Employer argues Dr. Ross's opinions were influenced by claimant's exaggerations of the nature of his work accident. Employer also contends the Commission errantly dismissed Dr. Stanley's opinions without providing an adequate basis for doing so.

¶ 55   As we noted earlier, it is not the role of a reviewing court to substitute its judgment for that of the Commission simply because an alternative inference from the evidence could be reached. The evidence from this record shows claimant was working on October 14, 2019, when he suffered an accident. This is not in dispute. The record also shows claimant had no injuries or complaints to his head, neck, shoulders, or back prior to the work accident. Furthermore, no new injuries or accidents to claimant's head, neck, shoulders, or back occurred after the work accident. Numerous physicians opined as to the cause of claimant's condition of ill-being. The Commission found Dr. Ross to be more credible. Dr. Ross did not need to know the exact mechanism of claimant's accidental injury to determine the cause of his complaints. The Commission found Dr. Stanley's testimony was not credible. While Dr. Stanley did not dispute a work accident, he stated claimant was no longer suffering from his accidental injury at the time he had evaluated claimant. Additionally, Dr. Ross's and Dr. Alpert's testimonies contradicted Dr. Stanley's opinion claimant's pain was nonorganic. Accordingly, we find the Commission's decision finding claimant's condition of ill-being was causally related to his work accident was not against the manifest weight of the evidence.

¶ 56   Lastly, employer points to its previous contentions regarding the Commission's misunderstanding of claimant's mechanism of injury to argue its award of TTD was against the manifest weight of the evidence. However, employer's arguments misconstrue Dr. Ross's testimony. Dr. Ross testified he was not able to provide a complete diagnosis of claimant when he

originally evaluated him in December 2019 because claimant's shoulder pain had caused him to be guarded. Dr. Ross later evaluated claimant and determined claimant's complaints were related to myelopathy due to disk herniations putting pressure on his spinal cord. The award of TTD and prospective medical care were due to these spinal injuries, not because of radiculopathy or a brachial plexus injury, which Dr. Ross determined were not the cause of claimant's pain. Accordingly, the Commission's TTD award and prospective medical care were not against the manifest weight of the evidence.

¶ 57                                    III. CONCLUSION

¶ 58        For the reasons stated, we affirm the circuit court's judgment confirming the decision of the Commission.

¶ 59        Affirmed.